Francis J. "Casey" Flynn, Jr., #304712
LAW OFFICE OF FRANCIS J. FLYNN, JR.
5067 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

ROWLEY LAW PLLC
Shane T. Rowley (to seek admission pro hac vice)
Danielle Rowland Lindahl (to seek admission pro hac vice)
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Email: srowley@rowleylawpllc.com
          drl@rowleylawpllc.com

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DONALD WALLACE,** derivatively on behalf of Block, Inc.,<br><br>**Plaintiff,**<br><br>v.<br><br>**AMRITA AHUJA, ROELOF BOTHA, AMY BROOKS, SHAWN "JAY-Z" CARTER, PAUL DEIGHTON, JACK DORSEY, RANDALL GARUTTI, JAMES McKELVEY, MARY MEEKER, and NEHA NARULA,**<br><br>**Defendants,**<br><br>-and-<br><br>**BLOCK, INC.,** a Delaware Corporation,<br><br>**Nominal Defendant.** | **CASE NO.** 4:25-cv-2202<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S DERIVATIVE COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**<br><br>**(1) Breach of Fiduciary Duty (Derivatively Against the Director Defendants)**<br>**(2) Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)** |

- 1 -    PLAINTIFF'S CLASS ACTION COMPLAINT

113936v1

| | **(3) Violation of Section 14(a) of the Exchange Act (Against The Director Defendants)** |

Plaintiff Donald Wallace ("Plaintiff"), derivatively on behalf of Block, Inc. ("Block" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Gonsalves v. Block, Inc. et al.*, Case No. 5:25-cv-642 (N.D. Cal.); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Block, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 26, 2020, to April 30, 2024. During that time the Defendants (as defined herein) caused or allowed Block to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. Between February 26, 2020, and April 30, 2024, Defendants claimed that Block had "implemented an [anti-money laundering] AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity." Defendants also stated that this compliance program was "designed to prevent [Block's] network from being used to facilitate business in countries, or with persons or entities, included on

designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities." Defendants touted Block's "policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer" and its "vet[ting] and monitor[ing]" of the transactions on Block's platforms, which Defendants claimed addressed the Company's "legal and regulatory requirements and [were designed] to assist in managing risk associated with money laundering and terrorist financing."

3.      These and similar representations made by Defendants were materially false and misleading. In actuality, Block failed to implement even basic due diligence and know your customer ("KYC") protocols, effectively creating a sanctuary for criminal activities on its Square and Cash App platforms. As a result, numerous illegal activities proliferated on Block products.  Namely, Company customers used Block products to engage in money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions. Block failed to report thousands of suspicious transactions to regulatory authorities, permitted customers subject to sanctions alerts to complete transactions before the alerts were resolved, and failed to screen customer biographies against sanctions key word lists. Former employees later revealed that Defendants failed to take remedial measures, even after senior Block leadership was alerted to these shortfalls despite numerous red flags, which led to multiple whistleblower complaints and probes by regulators.

4.      As a result of Defendants' wrongful acts and omissions, the market value of Block Class A common stock dropped 77% to a low of less than $66 per share from its peak of over $289 per share, and investors suffered significant financial losses and economic damages.

5.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

**PARTIES**

A.    **Plaintiff**

6.     Plaintiff Donald Wallace is a current shareholder of Block and has continuously held Block stock during all times relevant hereto and is committed to retaining Block shares through the pendency of this action to preserve Plaintiff's standing.  Plaintiff will adequately and fairly represent the interests of Block and its shareholders in enforcing its rights.

B.    **Nominal Defendant**

7.     Nominal Defendant Block is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1955 Broadway, Suite 600, Oakland, CA 94612. Shares of Block Class A common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SQ."

C.    **Individual Defendants**

8.     Defendant Jack Dorsey is the Co-Founder of Block (previously called "Square") and has served as Principal Executive Officer and Chairman of the Company's Board of Directors since 2009.  His title was changed to "Block Head" in 2022.

9.     Defendant Roelof Botha has been a director of the Company since 2011.

10.    Defendant Amy Brooks has been a director of the Company since 2019.

11.    Defendant Shawn "JAY-Z" Carter has been a director of the Company since 2021.

12. Defendant Paul Deighton has been a director of the Company since 2016.

13. Defendant Randall Garutti has been a director of the Company since 2017.

14. Defendant James McKelvey has been a director of the Company since 2009.

15. Defendant Mary Meeker has been a director of the Company since 2011.

16. Defendant Neha Narula has been a director of the Company since 2023.

17. Defendants Dorsey, Botha, Brooks, Carter, Deighton, Garutti, McKelvey, Meeker, and Narula are herein referred to as "Director Defendants."

18. Defendant Amrita Ahuja has served as the Chief Financial Officer ("CFO") of the Company since 2019 and the Chief Operating Officer ("COO") of the Company since February 2023.

19. Defendants Dorsey and Ahuja are herein referred to as "Officer Defendants."

### JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this court under 28 U.S.C. § 1391, because the Company is based in this District and a significant amount of the conduct at issue took place and had an effect in this District.

## DIVISIONAL ASSIGNMENT

24. This Division is proper pursuant to Norhtern Dist. L.R. 3-5(b) as Block, Inc. is headquartered in Oakland, California and a significant amount of the conduct at issue took place and had an effect in Oakland.

## SUBSTANTIVE ALLEGATIONS

A. **Company Background**

25. Block is a financial technology conglomerate. The Company's inaugural product is Square, a financial services platform for small and medium-sized businesses. The Company later launched Cash App (f/k/a "Square Cash"), a mobile payment service that allows users to transfer money using a mobile phone. Through the Cash App, users can transact in bitcoin, and Block boasts of providing a "frictionless" consumer experience with minimal obstacles to opening an account, sending and receiving payments, and depositing and withdrawing funds.

B. **Block's False and Misleading Statements**

26. From at least February 26, 2020, through April 30, 2024, Block and its executive officers made materially false and misleading statements about AML and other compliance protocols designed to prevent the use of the Company's products and services from being used for illegal or criminal activities.

27. On February 26, 2020, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2019 (the "FY19 Letter"). The FY19 Letter stated that, for the fourth quarter, Block achieved 41%

year-over-year total net revenue growth to $1.31 billion and 39% year-over-year gross profit growth to $527 million. The FY19 Letter stated that, for the year, Block achieved 43% year-over-year total net revenue growth to $4.71 billion and 45% year-over-year gross profit growth to $1.89 billion. The FY19 Letter stated that, for its Square segment, Block achieved 26% year-over-year revenue growth to $938 million and 27% year-over-year gross profit growth to $379 million in the fourth quarter. The FY19 Letter stated that, for its Cash App segment, Block achieved 147% year-over-year revenue growth to $361 million and 104% year-over-year gross profit growth to $144 million in the fourth quarter. The FY19 Letter also stated that Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth.

28.     On that same day, Block filed with the SEC an annual report on Form 10- K for its fiscal year ended December 31, 2019, which included the above financial and operating information, and stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business." The Form 10-K also stated that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."  In particular, the Form 10-K represented that the Company had implemented an effective AML program:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

(Emphasis added.)

29. On May 6, 2020, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2020 (the "1Q20 Letter"). The 1Q20 Letter stated that, for the quarter, Block achieved 44% year-over-year total net revenue growth to $1.38 billion and 36% year-over-year gross profit growth to $539 million. The 1Q20 Letter stated that, for its Square segment, Block achieved 16% year-over-year revenue growth to $853 million and 18% year-over-year gross profit growth to $356 million. The 1Q20 Letter stated that, for its Cash App segment, Block achieved 197% year-over-year revenue growth to $528 million and 115% year-over-year gross profit growth to $183 million. The 1Q20 Letter also stated that, in April, "Cash App delivered strong revenue and gross profit growth year over year, and achieved its highest monthly totals for net-new transacting active customers, peer-to-peer volumes, Cash Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

30. On that same day, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2020, which included the above financial and operating information, and again stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

31. On August 4, 2020, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2020 (the "2Q20 Letter"). The 2Q20 Letter stated that, for the quarter, Block achieved 64% year-over-year total net revenue growth to $1.92 billion and 28% year-over-year gross profit growth to $597 million. The 2Q20 Letter stated that, for its Square segment, Block had quarterly revenue of $723 million and gross profit of $316 million, with both

metrics negatively impacted by the onset of the COVID-19 pandemic. The 2Q20 Letter stated that, for its Cash App segment, Block achieved 361% year-over-year revenue growth to $1.2 billion and 167% year-over-year gross profit growth to $281 million. The 2Q20 Letter also stated that, in June, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

32.    On August 5, 2020, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2020, which included the financial and operating information above and again stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

33.    On November 5, 2020, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2020 (the "3Q20 Letter"). The 3Q20 Letter stated that, for the quarter, Block achieved 140% year-over-year total net revenue growth to $3.03 billion and 59% year-over-year gross profit growth to $794 million. The 3Q20 Letter stated that, for its Square segment, Block achieved 5% year-over-year revenue growth to $965 million and 12% year-over-year gross profit growth to $409 million. The 3Q20 Letter stated that, for its Cash App segment, Block achieved 574% year-over-year revenue growth to $2.07 billion and 212% year-over-year gross profit growth to $385 million. The 3Q20 Letter also stated that, in the third quarter of 2020, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

34.    On that same day, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2020, which included the financial and operating information above and again stated that Block had put in

place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and  that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

35.    On January 4, 2021, Block issued a press release opposing regulations proposed by the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") to enhance KYC and due diligence requirements for the processing of cryptocurrency transactions. The release claimed that one of Block's "core principles" was "that people should have the ability to participate in financial systems easily and equitably." The release claimed that Square had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective" rendering the proposed rules "unnecessary." The release further claimed that "private sector solutions and companies" such as those offered by Block were better at mitigating risks.  The release stated that "[f]lexible, risk-based regulation allows compliance programs to be more comprehensive and actually mitigate risk using tools that are compatible with blockchain technology." The release claimed that Square was "able to use data that is available through blockchain analysis to identify signals of unlawful activity." According to the release, Block's efforts and coordination with regulators had "prove[n] extraordinarily effective in identifying and stopping illicit activities."

36.    On February 23, 2021, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2020 (the "FY20 Letter"). The FY20 Letter stated that, for the fourth quarter, Block achieved 141% year-over-year total net revenue growth to $3.16 billion and 52% year-over-year gross profit growth to $804 million.  The FY20 Letter stated that, for the year, Block achieved 101% year-over-year total net revenue growth to $9.5 billion and 45% year-over-year gross profit growth to $2.73 billion.  The FY20 Letter stated

that, for its Square segment, Block achieved 5% year-over-year revenue growth to $987 million and 13% year-over-year gross profit growth to $427 million in the fourth quarter. The FY20 Letter stated that, for its Cash App segment, Block achieved 502% year-over-year revenue growth to $2.17 billion and 162% year-over-year gross profit growth to $377 million in the fourth quarter. The FY20 Letter also stated that "Cash App continued to drive strong acquisition of new customers and retain its existing base: In December, Cash App had more than 36 million monthly transacting active customers, up more than 50% year over year."

37.    On that same day, Block filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2020, that included the financial and operating information above and again stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts." The Form 10-K again represented that the Company had implemented an effective AML program:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. <u>We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.</u>

(Emphasis added.)

38.    On May 6, 2021, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2021 (the "1Q21 Letter"). The 1Q21 Letter

stated that, for the quarter, Block achieved 266% year-over-year total net revenue growth to $5.06 billion and 79% year-over-year gross profit growth to $964 million. The 1Q21 Letter stated that, for the Square segment, Block achieved 19% year-over-year revenue growth to $1.02 billion and 32% year-over-year gross profit growth to $468 million.  The 1Q21 Letter stated that, for the Cash App segment, Block achieved 666% year-over-year revenue growth to $4.04 billion and 171% year-over-year gross profit growth to $495 million. The 1Q21 Letter also stated: "We continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

39.    On that same day, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2021, which included the financial and operating information above, and again stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

40.    On August 1, 2021, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2021 (the "2Q21 Letter"). The 2Q21 Letter stated that, for the quarter, Block achieved 143% year-over-year total net revenue growth to $4.68 billion and 91% year-over-year gross profit growth to $1.14 billion. The 2Q21 Letter stated that, for the Square segment, Block achieved 81% year-over-year revenue growth to $1.31 billion and 85% year-over-year gross profit growth to $585 million. The 2Q21 Letter stated that, for the Cash App segment, Block achieved 177% year-over-year revenue growth to $3.33 billion and 94% year-over-year gross profit growth to $546 million. The 2Q21 Letter also stated that, in the second quarter, "volume sent through Cash App's network

increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

41.    On August 2, 2021, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2021, that included the financial and operating information above, and again stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

42.    On November 4, 2021, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2021 (the "3Q21 Letter"). The 3Q21 Letter stated that, for the quarter, Block achieved 27% year-over-year total net revenue growth to $3.84 billion and 43% year-over-year gross profit growth to $1.13 billion. The 3Q21 Letter stated that, for the Square segment, Block achieved 44% year-over-year revenue growth to $1.39 billion and 48% year-over-year gross profit growth to $606 million. The 3Q21 Letter stated that, for the Cash App segment, Block achieved 16% year-over-year revenue growth to $2.39 billion and 33% year-over-year gross profit growth to $512 million. The 3Q21 Letter also stated: "In October, we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly activities, engagement across our ecosystem, and inflows into Cash App."

43.    On that same date, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2021, which included the financial and operating information above, and reiterated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the

-13-
PLAINTIFF'S DERIVATIVE COMPLAINT

Company's] customers and the transactions we process for them as part of our risk management efforts."

44.    On February 24, 2022, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2021 (the "FY21 Letter"). The FY21 Letter stated that, for the fourth quarter, Block achieved 29% year-over-year total net revenue growth to $4.08 billion and 47% year-over-year gross profit growth to $1.18 billion. The FY21 Letter stated that, for the year, Block achieved 86% year-over-year total net revenue growth to $17.66 billion and 62% year-over-year gross profit growth to $4.42 billion. The FY21 Letter stated that, for the Square segment, Block achieved 49% year-over-year revenue growth to $1.47 billion and 54% year-over-year gross profit growth to $657 million in the fourth quarter. The FY21 Letter stated that, for the Cash App segment, Block achieved 18% year-over-year revenue growth to $2.55 billion and 37% year-over-year gross profit growth to $518 million in the fourth quarter. The FY21 Letter also stated: "We drove growth in net new transacting activities and strong engagement across products in our Cash App ecosystem."

45.    That same day, Block held a conference call to discuss the Company's fourth fiscal quarter of 2021 hosted by defendants Dorsey and Ahuja. In response to an analyst question, defendant Dorsey claimed that Block was focused on preventing fraud on Cash App:

> Well, I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud. We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.
>
> So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever.

(Emphasis added.)

46.    Also on February 24, 2022, Block filed with the SEC an annual report on Form 10- K for its fiscal year ended December 31, 2021, which included the financial and operating information above, and yet again represented that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts." The Form 10-K, yet again, represented that the Company had implemented an effective AML program designed to prevent money laundering:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

(Emphasis added.)

47.    On May 5, 2022, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2022 (the "1Q22 Letter"). The 1Q22 Letter stated that, for the quarter, Block achieved total net revenue of $3.96 billion, which was down 22% year over year due to a decrease in Bitcoin revenue, and gross profit growth of 34% to $1.29 billion. The 1Q22 Letter stated that, for the Square segment, Block achieved 42% year-over-year revenue growth to $1.44 billion and 41% year-over-year gross profit growth to $661 million. The 1Q22 Letter stated that, for the Cash App segment, Block achieved revenue of $2.46 billion and gross profit growth of 26% to $624 million. The 1Q22 Letter also stated: "We are focused

on expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10 million Cash App accounts have bought bitcoin since the product was introduced."

48.    On that same date, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2022, which included the financial and operating information above, and stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

49.    On August 4, 2022, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2022 (the "2Q22 Letter"). The 2Q22 Letter stated that, for the quarter, Block achieved total net revenue of $4.4 billion, which was down 6% year over year due to a decrease in bitcoin revenue, and gross profit growth of 29% to $1.47 billion.  The 2Q22 Letter stated that, for the Square segment, Block achieved 32% year-over-year revenue growth to $1.73 billion and 29% year-over-year gross profit growth to $755 million. The 2Q22 Letter stated that, for the Cash App segment, Block achieved revenue of $2.62 billion and gross profit growth of 29% to $705 million. The 2Q22 Letter also stated: "We drove growth in net new transacting activities and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

50.    On that same date, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2022, which included the financial and operating information above, and that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's]

customers and the transactions we process for them as part of our risk management efforts."

51.    On November 3, 2022, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2022 (the "3Q22 Letter"). The 3Q22 Letter stated that, for the quarter, Block achieved 17% year-over-year total net revenue growth to $4.52 billion and 38% year-over-year gross profit growth to $1.57 billion. The 3Q22 Letter stated that, for the Square segment, Block achieved 27% year-over-year revenue growth to $1.77 billion and 29% year-over-year gross profit growth to $783 million. The 3Q22 Letter stated that, for the Cash App segment, Block achieved 12% year-over-year revenue growth to $2.68 billion and 51% year-over-year gross profit growth to $774 million. The 3Q22 Letter also stated: "We drove growth in net new transacting activities and strong engagement across products in our Cash App ecosystem."

52.    Also on November 3, 2022, Block filed with the SEC a quarterly report on Form 10-Q with the SEC for its third fiscal quarter ended September 30, 2022, which included the financial and operating information above, and stated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

53.    On February 23, 2023, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2022 (the "FY22 Letter"). The FY22 Letter stated that, for the fourth quarter, Block achieved 14% year-over-year total net revenue growth to $4.65 billion and 40% year-over-year gross profit growth to $1.66 billion. The FY22 Letter stated that, for the year, Block achieved $17.53 billion in total net revenue and 36% year-over-year gross profit growth to $5.99 billion. The FY22 Letter stated that, for the Square segment, Block

achieved 19% year-over-year revenue growth to $1.76 billion and 22% year-over-year gross profit growth to $801 million in the fourth quarter. The FY22 Letter stated that, for the Cash App segment, Block achieved 12% year-over-year revenue growth to $2.68 billion and 64% year-over-year gross profit growth to $848 million in the fourth quarter. The FY22 Letter also stated: "We ended the year with 51 million monthly transacting activities in December, with two out of three transacting each week on average."

54.     Also on February 23, 2023, Block filed with the SEC an annual report on Form 10- K for its fiscal year ended December 31, 2022, which included the financial and operating information above, and that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts." The Form 10-K yet, once again, represented that the Company had implemented an effective AML program:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. <u>We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.</u>

(Emphasis added.)

55.     The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and

operations. Specifically, the statements failed to disclose that: (a) over numerous years, Block had failed to conduct basic due diligence with respect to its Square and Cash App, including failing to monitor its customers' identities and/or the nature of financial transactions on its platforms so as to prevent their products from being used for illegal and/or illicit activities; (b) Block had effectively created a harbor for unlawful activities on its Square and Cash App platforms by putting in place bare requirements for customers who sought to open accounts and make transactions, encouraging the use of bitcoin, and influencing the Company's banking partners to forgo ordinary KYC due diligence activities; (c) Block permitted thousands of transactions on Square and Cash App to be made in connection with illegal, unlawful, and/or illicit activities such as money laundering, child abuse, trafficking, terrorism, contract killing, and payments to persons/entities subject to economic sanctions; (d) Block permitted its customers to withdraw funds even after the accounts had been flagged for potentially unlawful/illicit activities; (e) Block enabled customers to open multiple accounts using false identification in order to engage in illegal/illicit activities; (f) Block's executives and directors failed to remedy the foregoing compliance failures despite these numerous red flags, employee reports of inaction, and customer complaints; (g) Block's Cash App user metrics had been artificially inflated through the use of fabricated accounts and the ability of transgressors to open multiple accounts; and (h) as a result of the above, Block was exposed to reputational harm, adverse regulatory action, and loss of business, as well as other adverse impacts to the Company's operations and financial results.

C.    **The Market Learns The Truth**

56.    On March 23, 2023, an analyst firm Hindenburg Research published a damaging report exposing the Company titled: "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders To Cash Out Over $1

Billion" (the "Hindenburg Report"). The Hindenburg Report claimed to have conducted a two-year investigation that included interviews with dozens of former Block employees, partners, and industry experts, an exhaustive review of regulatory and litigation records, and the receipt of materials pursuant to the Freedom of Information Act and public records requests. The Hindenburg Report detailed Block's careless compliance program, stating that the "'magic'" of Block's success had been "the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics." The Hindenburg Report detailed Block's "Wild West" approach to making it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly." Cash App was reportedly widely used for, *inter alia*, sex trafficking, drug trafficking, consumer scams, COVID-19 relief fraud, and even contract killing payments.

57.     Former employees reportedly described how the Cash App constantly concealed internal concerns and ignored user pleas and numerous red flags to allow criminal activity to proliferate on the platform and claimed that the Company willfully disregarded AML rules. According to the Hindenburg Report: "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities." The Hindenburg Report also stated that permitting illegal and illicit activities had allowed Block to artificially inflate its Cash App user metrics and artificially understate Cash App's customer acquisition costs.

58.     On this news, the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023 – a decline of nearly 15% on unusually heavy trading

volume of over 140 million shares traded – and continued to fall the next trading day. Because Defendants failed to disclose the full truth and continued to make material misrepresentations and omissions to the public, the price of Block Class A common stock remained artificially inflated.

59. Within hours of the release of the Hindenburg Report, on March 23, 2023, Block issued a press release denying the report's allegations, describing the Hindenburg Report as "factually inaccurate and misleading" and stated that the Company would be pursuing regulatory redress with the SEC against Hindenburg Research:

> We intend to work with the SEC and explore legal action against Hindenburg Research for the factually inaccurate and misleading report they shared about our Cash App business today.
>
> Hindenburg is known for these types of attacks, which are designed solely to allow short sellers to profit from a declined stock price. We have reviewed the full report in the context of our own data and believe it's designed to deceive and confuse investors.
>
> We are a highly regulated public company with regular disclosures, and are confident in our products, reporting, compliance programs, and controls. We will not be distracted by typical short seller tactics.

(Emphasis added.)

60. On May 4, 2023, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2023 (the "1Q23 Letter"). The 1Q23 Letter stated that, for the quarter, Block achieved 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion. The 1Q23 Letter stated that, for its Square segment, Block achieved 15% year-over-year revenue growth to $1.67 billion and 16% year-over-year gross profit growth to $770 million. The 1Q23 Letter stated that, for its Cash App segment, Block achieved 33% year-over-year revenue growth to $3.27 billion and 49% year-over-year gross profit growth to $931 million. The 1Q23 Letter also stated: "We drove

growth in net new transacting activities and strong engagement across products in our Cash App ecosystem."

61. That same day, Block held a conference call to discuss the Company's first fiscal quarter of 2023 hosted by defendants Dorsey and Ahuja. The first question by an analyst was about the Hindenburg Report. In response, defendant Dorsey denied the allegations in the Hindenburg Report and stated: "I would say that we stand by our response to the shareholder report. . . . [Our] regulators trust us as well. So this is a significant focus for us and always has been." Defendant Ahuja provided additional detail, claiming that Block maintained a vigorous culture of compliance:

> Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products. In order to do that, we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years.

(Emphasis added.)

62. Also on May 4, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2023, that included the financial and operating information above and reiterated that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

63. On August 3, 2023, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2023 (the "2Q23 Letter"). The 2Q23 Letter stated that, for the quarter, Block achieved 26% year-over-year total

net revenue growth to $5.53 billion and gross profit growth of 27% to $1.87 billion. The 2Q23 Letter stated that, for its Square segment, Block achieved 12% year-over-year revenue growth to $1.93 billion and 18% year-over-year gross profit growth to $888 million. The 2Q23 Letter stated that, for its Cash App segment, Block achieved 36% year-over-year revenue growth to $3.56 billion and 37% year-over-year gross profit growth to $968 million. The 2Q23 Letter also stated: "We drove growth in net new transacting activities and strong engagement across products in our Cash App ecosystem."

64.    Also on August 3, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2023 (the "2Q23 Form 10-Q"), which included the financial and operating information above, and again reiterated that Block had put in place a "compliance program focused on the laws, rules, regulations, and standards applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

65.    The 2Q23 Form 10-Q also revealed that the SEC and the U.S. Department of Justice were investigating the allegations against Block and its employees contained in the Hindenburg Report, despite Defendants' prior assertions that the SEC should investigate Hindenburg Research for purportedly misleading Block investors.

66.    On this news, the price of Block Class A common stock fell from $73.55 per share at market close on August 3, 2023, to $63.52 per share at market close on August 4, 2023, a decline of nearly 14% on unusually heavy trading volume of over 33 million shares traded. Because Defendants failed to disclose the full truth and continued to make material misrepresentations and omissions, the price of Block Class A common stock remained artificially inflated.

67. On November 2, 2023, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2023 (the "3Q23 Letter"). The 3Q23 Letter stated that, for the quarter, Block achieved 24% year-over-year total net revenue growth to $5.62 billion and 21% year-over-year gross profit growth to $1.9 billion. The 3Q23 Letter stated that, for its Square segment, Block achieved 12% year-over-year revenue growth to $1.98 billion and 15% year-over-year gross profit growth to $899 million. The 3Q23 Letter stated that, for its Cash App segment Block achieved 34% year-over-year revenue growth to $3.58 billion and 27% year-over-year gross profit growth to $984 million. The 3Q23 Letter also stated that, in September, "Cash App had 55 million monthly transacting activities, up 11% year over year."

68. On that same day, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2023, that included the financial and operating information above, and represented that Block had put in place a "compliance program focused on the laws, rules, regulations, and standards applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

69. The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (a) over numerous years, Block had failed to conduct basic due diligence with respect to its Square and Cash App, including failing to monitor its customers' identities and/or the nature of financial transactions on its platforms so as to prevent their products from being used for illegal and/or illicit activities; (b) Block had effectively created a harbor for unlawful activities on its Square and Cash App platforms by putting in place bare requirements for customers who sought to open accounts and make

transactions, encouraging the use of bitcoin, and influencing the Company's banking partners to forgo ordinary KYC due diligence activities; (c) Block permitted thousands of transactions on Square and Cash App to be made in connection with illegal, unlawful, and/or illicit activities such as money laundering, child abuse, trafficking, terrorism, contract killing, and payments to persons/entities subject to economic sanctions; (d) Block permitted its customers to withdraw funds even after the accounts had been flagged for potentially unlawful/illicit activities; (e) Block enabled customers to open multiple accounts using false identification in order to engage in illegal/illicit activities; (f) Block's executives and directors failed to remedy the foregoing compliance failures despite these numerous red flags, employee reports of inaction, and customer complaints; (g) Block's Cash App user metrics had been artificially inflated through the use of fabricated accounts and the ability of transgressors to open multiple accounts; and (h) as a result of the above, Block was exposed to reputational harm, adverse regulatory action, loss of business, as well as other adverse impacts to the Company's operations and financial results.

70.    On February 16, 2024, *NBC News* reported that federal regulators were probing allegations made by two whistleblowers that Cash App had "no effective procedure to establish [users'] identity," ameliorating potential money laundering, terrorism financing, and other illegal and/or illicit activities. The whistleblowers also identified Cash App transactions with entities under sanctions by the U.S. Department of the Treasury's Office of Foreign Assets Control, operations known to sell personal information and credit card data for illegal purposes, and offshore gambling sites barred to U.S. citizens. The whistleblowers stated that they had filed complaints with the FinCEN, the SEC, and the Commodity Futures Trading Commission ("FTC"). The whistleblowers described Block as running "a shadow financial system beyond the reach of regulators." According to the report, Cash App had pressured its banking partners to forgo

traditional due diligence and KYC steps for the exact purpose of easing the process of account opening in order to generate revenues. In addition, according to the whistleblowers, the Company reportedly isolated and prevented visibility of parts of the transactions on the Cash App from its banking partners, in turn preventing them from reviewing the entire nature of the transactions, thereby hindering the bankers' ability to identify illegal and/or illicit activities. The whistleblowers' report pointed to Block's 2018 decision to allow bitcoin transactions on its platforms, which allegedly eased terrorist financing worldwide. The whistleblowers further alleged that Block had allowed a market for opened Cash App accounts on the black market that permitted criminals to avoid even the minimum due diligence involved in setting up a new account.

71.    On this news, the price of Block Class A common stock fell from $69.48 per share at market close on February 15, 2024, to $65.64 per share at market close on February 16, 2024 – a decline of over 5% on unusually heavy trading volume of over 12 million shares traded. Because Defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock still remained artificially inflated.

72.    On May 1, 2024, *NBC News* reported that federal prosecutors were investigating Block due to allegations by a former employee that the Company had engaged in extensive compliance failures over multiple years with respect to its two main units, Square and Cash App. The employee had allegedly provided prosecutors with internal Company records which prove that Block had failed to conduct basic due diligence on its customers and transactions, that Square had processed thousands of transactions involving countries subject to economic sanctions (including Cuba, Iran, Russia, and Venezuela), and that Block had processed multiple cryptocurrency transactions for terrorist groups.

73.     According to the investigation, Block also purportedly failed to properly report transactions to U.S. regulatory authorities and failed to correct compliance breaches even after being alerted to them.  Documents turned over by the whistleblower purportedly showed that these violations were known by the Company's senior management and the Board. According to Block's former employee: "From the ground up, everything in the compliance section was flawed . . . . It is led by people who should not be in charge of a regulated compliance program."

74.     The article also described egregiously deficient compliance policies and practices, including permitting Block's customers subject to a sanctions alert to withdraw funds before the alert review was complete or failing to screen against sanctions keyword lists. The employee denied Block's contention that it had voluntarily reported thousands of such suspicious transactions, stating that Block had actually failed to report thousands of such transactions.

75.     Moreover, the report stated that, in 2023, Block had hired an outside consultant who identified nearly 50 instances of failures and/or deficiencies in the Company's internal process for identifying suspicious activities. Together, the two reports by *NBC News* corroborated the allegations contained in the Hindenburg Report, contradicting Defendants' denials.

76.     On this news, the price of Block Class A common stock fell from $73 per share at market close on April 30, 2024, to $66.84 per share at market close on May 1, 2024 – a decline of over 8% on unusually heavy trading volume of over 22 million shares traded.

77.     In Block's Form 10-Q quarterly report, filed on August 1, 2024, the Company stated that in July 2024 it had received a follow-on inquiry from the SEC regarding the Company's alleged compliance as described in the Hindenburg Report.

78.    On January 15, 2025, a consortium of 48 state regulatory agencies announced that Block had agreed to pay $80 million for violations of the Bank Secrecy Act and AML laws. The Company also agreed to remedy ongoing failures, submit to the review of an independent consultant, and provide a progress report to the agencies within nine months.

79.    On January 16, 2025, the CFPB ordered Block to pay restitution to consumers up to $120 million and to pay a penalty of $55 million into the CFPB's victims relief fund. The CFPB found that Block employed weak security protocols for Cash App that put users at risk of fraud and then attempted to avoid its investigative obligations by using fine print to escape legal obligations. The CFPB found that when Block conducted investigations, the Company used intentionally deficient investigation practices to close out reports of unauthorized transactions in its favor.

80.    Per the CFPB, Block also failed to provide effective customer service to Cash App users, leaving them vulnerable to fraudulent transactions. Specifically, consumers looking for an alternate route to Cash App customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information. The CFPB found that Block knew the foregoing fraudulent practices but failed to timely intervene to redress the issue. In addition to monetary fines, Block was ordered to remedy defects in its customer service and support operations.

D.    **Defendants' Misconduct Has and Continues to Harm the Company**

81.    As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Gonsalves v. Block, Inc. et al.*, Case No. 5:25-cv-642

(N.D. Cal.), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

82.     Block's reputation and goodwill have also been damaged by the Defendants' misconduct because, as set forth above, a slew of governmental agencies are investigating Block's infractions.

E.     **Block Issues False and Misleading Proxy Statements**

83.     In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 24, 2020, April 29, 2021, April 28, 2022, April 28, 2023, and through 2024, that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

84.     The Director Defendants drafted, approved, reviewed, and/or signed these Proxy Statements before they were filed with the SEC and disseminated to Block's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

85.     In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2020 and 2021 Proxy Statements as follows:

**Risk Management**

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. This includes the oversight of our Enterprise Risk Assessment ("ERA") framework, which is supported and enabled by our audit and risk committee. While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach which delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are thoroughly discussed and that a pervasive understanding of such focus areas is obtained. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review as strategic, operational, people, financial and compliance and consist of risks such as cybersecurity, financial reporting and competition. Our board of directors may delegate additional risk areas in the future. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested.

86.    The 2022, 2023, and 2024 Proxy Statements further provide:

**Risk Management**

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. The oversight responsibility of our board of directors and its committees is enabled by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures and escalates potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an Enterprise Risk Assessment ("ERA") on an annual basis, which is shared and discussed with our board of directors. The oversight of the ERA is supported and enabled by our audit and risk committee. In addition, our board of directors' responsibilities related to oversight of the ERA framework include a routine evaluation of the processes, as well as discussions with key management and representatives of outside advisors as appropriate, used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review as strategic, operational, people, financial

and compliance and consist of risks such as cybersecurity, financial reporting and competition.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach which delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are thoroughly discussed and that a pervasive understanding of such focus areas is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas in the future.

87. The Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning its compliance process for identifying and eliminating illicit transactions, as further described above.

88. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

F. **The Board Breached its Fiduciary Duties**

89. As officers and/or directors of Block, the Defendants owed Block fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Block in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Block, the absence of good faith on their part, and a reckless disregard for their duties to the Company that

Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

90. Defendants, because of their positions of control and authority as directors and/or officers of Block, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Block's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

91. To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Block were required to, among other things:

> **(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;**

> **(b)     Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;**

> **(c)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;**

> **(d)     Oversee public statements made by the Company's officers and employees as to the financial condition of**

**the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;**

**(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;**

**(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and**

**(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.**

92.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

93.    The Board's Audit Committee is tasked with overseeing Block's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Block's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit and Risk Committee's charter, the Audit and Risk Committee's responsibilities include:

1. Select and Hire the Independent Auditor and Any Other Registered Public Accounting Firm. The Audit and Risk Committee shall be responsible for appointing, compensating, retaining and, where appropriate, replacing the Independent Auditor. The Independent Auditor will report directly to the Audit and Risk Committee. The Audit and Risk Committee shall have sole authority to approve the hiring and discharging of the Independent Auditor, all audit engagement fees and terms and all permissible non-audit engagements with the Independent Auditor. The Audit and Risk Committee shall also appoint, retain, compensate, oversee and where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

2. Supervise and Evaluate the Independent Auditor and Any Other Registered Public Accounting Firm. The Audit and Risk Committee shall:

• Oversee and evaluate the work of (i) the Independent Auditor and (ii) any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services for the Company, which evaluation shall include a review and evaluation of the lead partner of the Independent Auditor. The Audit and Risk Committee shall review, in consultation with the Independent Auditor, the annual audit plan and scope of audit activities and monitor such plan's progress.

• Review and resolve any disagreements that may arise between management and the Independent Auditor regarding internal controls or financial reporting.

• At least annually, obtain and review a report by the Independent Auditor that describes (i) the Independent Auditor's internal quality control procedures and (ii) any material issues raised by the most recent internal quality-control review, peer review or Public Company Accounting Oversight Board review of the Independent Auditor or by any other inquiry or investigation by governmental or professional authorities, within the preceding five years (or such other period as may be requested by the Audit and Risk Committee), regarding any independent audit performed by the Independent Auditor, and any steps taken to deal with any such issues.

3. Evaluate the Independence of the Independent Auditor. The Audit and Risk Committee shall:

• Review and discuss with the Independent Auditor the written independence disclosure required by the applicable requirements of the Public Company Accounting Oversight Board.

• Review and discuss with the Independent Auditor on a periodic basis any other relationships or services (including permissible non-

audit services) that may affect its objectivity and independence.

• Oversee the rotation of the Independent Auditor's lead audit and concurring partners and the rotation of other audit partners, with applicable time-out periods, in accordance with applicable law.

• Take, or recommend to the Board that it take, appropriate action to oversee the independence of the Independent Auditor.

4. Approve Audit and Non-audit Services and Fees. The Audit and Risk Committee shall (i) review and approve, in advance, the scope and plans for the audits and the audit fees and (ii) approve in advance (or, where permitted under the rules and regulations of the SEC, subsequently) all non-audit services to be performed by the Independent Auditor that are not otherwise prohibited by law and any associated fees. The Audit and Risk Committee may delegate to one or more members of the Audit and Risk Committee the authority to pre-approve audit and permissible non-audit services and any associated fees, as long as such pre-approval is presented to the full Audit and Risk Committee at scheduled meetings. The Audit and Risk Committee may, in accordance with applicable law, establish pre-approval policies and procedures for the engagement of the Independent Auditor to render services to the Company.

5. Review Financial Statements. The Audit and Risk Committee shall review and discuss the following with management and the Independent Auditor, as applicable:

• The scope and timing of the annual audit of the Company's financial statements.

• The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

• The results of the independent audit and the quarterly reviews, and the Independent Auditor's opinion on the annual financial statements.

• The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

• Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

• Analyses prepared by management or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

• The effect of regulatory and accounting initiatives on the Company's financial statements.

• Any significant changes required or taken in the audit plan as a

result of any material control deficiency.

• Any problems or difficulties the Independent Auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

• Any significant disagreements between management and the Independent Auditor.

6. Audited Financial Information; Audit and Risk Committee Report. The Audit and Risk Committee shall recommend that the audited financial statements be included in the Company's annual reports on Form 10-K and shall prepare, review and approve the report of the Audit and Risk Committee that SEC rules require to be included in the Company's annual proxy statement.

7. Reports and Communications from the Independent Auditor. The Audit and Risk Committee shall review and discuss quarterly reports from the Independent Auditor concerning the following:

• All critical accounting policies and practices to be used by the Company.

• All alternative treatments of financial information within generally accepted accounting principles ("**GAAP**") that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the Independent Auditor if different from that used by management.

• Other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences.

• Other matters required to be communicated to the Audit and Risk Committee under generally accepted auditing standards and other legal or regulatory requirements, including any matters required to be communicated under PCAOB Auditing Standards 1301, Communications with Audit Committees.

8. Earnings Press Releases and Earnings Guidance. The Audit and Risk Committee shall review and discuss (with particular attention to any use of non-GAAP financial measures) the Company's earnings press releases, shareholder letters, and financial information and earnings guidance provided to the public, analysts and ratings agencies.

9. Internal Controls. The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the Independent Auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or

other Company employees who have a significant role in the Company's internal controls.

10. Disclosure Controls and Procedures. The Audit and Risk Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

11. Internal Audit Function. The Audit and Risk Committee shall:

• Review and participate in the selection of the Company's internal auditor and periodically review the activities, organizational structure and qualifications of the internal audit function;

• Review and approve the annual internal audit project plan and any proposed changes and review periodic reports summarizing results of the internal audit projects including any significant findings;

• Review and reassess the adequacy of the charter of the Company's internal auditor, if any; and

• Periodically review with the Company's internal auditor any issues encountered in the course of the internal audit function's work.

12. Legal and Regulatory Compliance. The Audit and Risk Committee shall:

• Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "**Code**");

• Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

• Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and

• Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting or tax matters of the Company.

The Chief Compliance Officer shall meet with the Audit and Risk

Committee regularly and at least quarterly. The Chief Compliance Officer shall have dotted line reporting to the Audit and Risk Committee. The Chief Compliance Officer shall have the authority to communicate directly to the Chair of the Audit and Risk Committee and the Audit and Risk Committee at any time.

13. <u>Complaints</u>. The Audit and Risk Committee shall oversee procedures established for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

14. <u>Risks.</u> The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the Company's major financial and other risk exposures, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, the Company's programs, policies relating to legal and regulatory compliance, and operational security and reliability, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. The Audit and Risk Committee will also review the Company's risk management framework, programs, and policies, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

15. <u>Data Privacy and Cybersecurity Oversight.</u> The Audit and Risk Committee shall:

• Assist the Board in its oversight of the Company's data privacy, data security, and cybersecurity needs by staying apprised of the Company's data privacy and information security programs, strategy, policies, processes and material risks, and overseeing responses to security and data incidents; and

• Receive updates, at least quarterly, on material data privacy and security risk. The Chief Information Security Officer (or equivalent title thereof) shall meet with the Audit and Risk Committee regularly and at least quarterly. The Chief Information Security Officer shall have dotted line reporting to the Audit and Risk Committee. The Chief Information Security Officer shall have the authority to communicate directly to the Chair of the Audit and Risk Committee and the Audit and Risk Committee at any time.

16. <u>Related Party Transactions.</u> The Audit and Risk Committee shall (i) review and oversee all transactions between the Company and a related person for which review or oversight is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings and (ii) develop policies and procedures for the Audit and Risk Committee's review, approval and/or ratification of such transactions.

17. <u>Hiring of Auditor Personnel.</u> The Audit and Risk Committee shall

set hiring policies for the Company with regard to employees and former employees of the Independent Auditor.

18. Square Financial Services. The Audit and Risk Committee shall oversee the audit and risk-related matters involving the Company's industrial loan company subsidiary, Square Financial Services, Inc. ("**Square Financial Services**"). The Enterprise Risk Committee and Audit Committee of the Board of Directors of Square Financial Services shall report to the Audit and Risk Committee as set forth in Square Financial Services' governance documents or upon request, except as would not be permissible under applicable law.

19. The function of the Audit and Risk Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the Independent Auditor is responsible for auditing and reviewing those financial statements. The Audit and Risk Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the Independent Auditor. The Audit and Risk Committee is not responsible for providing any expert or special assurance as to the financial statements or the Independent Auditor's work. It is recognized that the members of the Audit and Risk Committee are not full-time employees of the Company, that it is not the duty or responsibility of the Audit and Risk Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and that each member of the Audit and Risk Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which the Audit and Risk Committee receives information and (ii) the accuracy of the financial and other information provided to the Audit and Risk Committee, in either instance absent actual knowledge to the contrary.

94.     In violation of the Audit Committee Charter, and their general duties as members of the Risk and Audit Committee, Defendants Deighton, Narula, and Botha conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

95.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

96.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Block.

## DERIVATIVE ALLEGATIONS

97.    Plaintiff brings this action derivatively in the right and for the benefit of Block to redress injuries suffered by Block as a direct result of the Director Defendants' breaches of fiduciary duty. Block is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

98.    Plaintiff will adequately and fairly represent the interests of Block in enforcing and prosecuting the Company's rights.

99.    Plaintiff was a stockholder of Block at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Block stockholder.

## DEMAND FUTILITY ALLEGATIONS

100.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth above as though fully set forth herein.

101.    The Block Board currently has nine members: Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula.

102. Plaintiff has not made any demand on Block's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

A.    **Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula Lack Independence Because They Face a Substantial Likelihood of Liability**

103. As alleged above, Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula breached their fiduciary duties by negligently issuing the materially false and misleading Proxies soliciting the reelection of themselves to the Board. Accordingly, Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula face a substantial likelihood of negligence liability for issuing the Proxies and any demand upon these defendants is therefore futile.

104. Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula face a substantial likelihood of liability for their individual misconduct. As alleged above, Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

105. In addition, Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the

Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Block.

106. Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula making or authorizing these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula facing a substantial likelihood of liability. If Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula were to bring a suit on behalf of Block to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula.

B.    **Defendants Ahuja and Dorsey are not Independent**

107. Defendant Dorsey is Block Head, Chairman, and cofounder of Block. Defendant Dorsey received compensation of $2.75 million in 2024. Defendant Dorsey depends on Block for his income. In addition, Block stated in the Schedule

14A Proxy Statement filed with the SEC on April 26, 2024, that Defendant Dorsey is not independent pursuant to SEC and NYSE rules.

108. Defendant Ahuja is Block's CFO and COO. Defendant Ahuja received compensation of $565,000 in 2024. In addition, Block stated in the Schedule 14A Proxy Statement filed with the SEC on April 26, 2024, that Defendant Ahuja is not independent pursuant to SEC and NYSE rules.

**C.    Defendants Deighton, Narula, and Botha are not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting**

109. Some of the Audit Committee's responsibilities are legal and regulatory compliance and review of the adequacy and effectiveness of the Company's internal controls. The Audit Committee was thus responsible for reviewing and approving Block's Forms 10-Q and 10-K filed between February 26, 2020 and April 30, 2024. Defendants Deighton, Narula, and Botha were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Deighton, Narula, and Botha caused improper statements by the Company to be made. Accordingly, Defendants Deighton, Narula, and Botha breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

110. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties

by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

111. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

112. Each of the Defendants owed and owes Block the highest obligations of loyalty, good faith, candor, due care, and oversight.

113. Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor, due care, and oversight to the Company.

114. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

115. In addition, the Director Defendants further breached their fiduciary duties owed to Block by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that Block failed to implement even basic due diligence and KYC protocols, effectively permitting illegal activities to proliferate on Block products including use of Block's platforms to engage in money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions. The Director Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the

false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

116. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

117. As a direct and proximate result of the breaches of duty alleged herein, Block has sustained and will sustain significant damages.

118. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

119. Plaintiff, on behalf of Block, has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

120. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

121. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Block the highest obligations of loyalty, good faith, due care, oversight, and candor.

122. The Officer Defendants breached their fiduciary duties owed to Block by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that Block failed to implement even basic due diligence and KYC protocols, effectively permitting illegal activities to proliferate on Block products including use of Block's platforms to engage in money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions. The Officer Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

123. As a direct and proximate result of the breaches of duty alleged herein, Block has sustained and will sustain significant damages.

124. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

125. Plaintiff, on behalf of Block, has no adequate remedy at law.

**COUNT III**
**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

126. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

128.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxies. In the Proxies, the Board solicited stockholder votes to re-elect the Director Defendants to the Board.

129.   The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Block misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to re-elect the Director Defendants.

130.   Plaintiff, on behalf of Block, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Block and that Plaintiff is a proper and adequate representative of the Company;

B.      Against all of the Defendants and in favor of Block for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.      Awarding Block restitution from Defendants, and each of them,

and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 4, 2025          By:   /s/ Francis J. "Casey" Flynn, Jr.
                                    Francis J. "Casey" Flynn, Jr., #304712
                                    LAW OFFICE OF FRANCIS J. FLYNN, JR.
                                    5067 Metropolitan Plz
                                    Los Angeles, CA 90036
                                    Tele: 314-662-2836
                                    Email: casey@lawofficeflynn.com

                                    ROWLEY LAW PLLC
                                    Shane T. Rowley (to seek admission pro hac vice)
                                    Danielle Rowland Lindahl (to seek admission pro hac vice)
                                    50 Main Street, Suite 1000
                                    White Plains, New York 10606
                                    Phone: (914) 400-1920
                                    Email: srowley@rowleylawpllc.com
                                           drl@rowleylawpllc.com

                                    **ATTORNEYS FOR PLAINTIFFS**